**WILLIAMSON, Appellee,**

v.

**WILLIAMSON, Appellant.**

[Cite as *Williamson v. Williamson,* 180 Ohio App.3d 260, 2008-Ohio-6718.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 07–CA–101.

Decided Dec. 19, 2008.

Heather F. Frank, for appellee.

Eric A. Stamps, for appellant.

BROGAN, Judge.

{¶ 1} This is an appeal of the Greene County Domestic Relations Court's judgment overruling objections to and adopting a magistrate's grant of a broad civil protection order ("CPO") to Mary Williamson, appellee, and her four children. Precipitating her petition was the imminent release from prison of Shawn Williamson, appellant, her ex-husband and father of the children. The evidence plainly does not support the grant of a CPO to protect the children. Whether the evidence is sufficient to find that Mary needs protection, however, is a closer question. After carefully reviewing the record and existing case law, we conclude that the evidence is also insufficient to warrant a CPO protecting her.

{¶ 2} The picture that the transcript of the hearing before the magistrate paints is of a mother who does not fear physical harm from her ex-husband as much as she fears allowing him back into her and her children's lives premature-

ly. Mary represented herself at the hearing, presenting a picture that is somewhat unique. We recognize that she may not have been able to express her concerns as articulately as an experienced attorney could have, but that she was unrepresented also means that we can read her concerns unfiltered by such an attorney. Her candid testimony reveals her as a mother who, remembering what she endured from Shawn before he entered prison, is wary of letting him back into her life without proof that he has changed. Here, in large part, is their exchange during her cross examination of him:

{¶ 3} "Q. I just wanted you to stop and consider, you know, all the years and things that we have been through and you were on the other side of that, maybe you didn't understand how serious those things were. I think right now that is all we have to go by as far as your behavior on this side of the prison wall. And I can only hope while you were in there that things have changed.

{¶ 4} "A. They have.

{¶ 5} "Q. But what evidence do I have? I have none. You've been out for two weeks, I'm glad you feel like you're doing very well. That's great. But at the same time, we've been five years basically without you in our lives and, like I said, the children are doing very well.

{¶ 6} "I'm not saying I don't ever want them to see you. I'm not asking for that. I'm just asking for the Court to consider—

{¶ 7} " * * *

{¶ 8} "Q. Do you understand where I'm coming from as far as trying to protect the children?

{¶ 9} "A. I understand you want to see that I've changed and I understand why we're here and that that's for your comfort; so you know what I'm about, and so you know that I'm doing all right. It's so you know I won't hurt the children, it's so you know I won't come after you or your family, and I understand that.

{¶ 10} "Q. What plans do you have for your life to change then? What are you going to do?

{¶ 11} "A. I sat three years locked up in the place they call Gladiator school. And I had cancer, and surgery after surgery after surgery. I went to Hocking College, I went to a million classes even though I was getting cut on. I'm covered in scars, I still have the cancer.

{¶ 12} "Q. But what are you going to do now, what are you going to do with your life?

{¶ 13} "A. My disability is going to be appealed, the State filed the disability for me. I have to do that.

{¶ 14} "Q. What is your specific disability that you've filed on?

{¶ 15} "A. I have germ cell cancer, fractured seventh cervical, bipolar disorder, anxiety disorder, post traumatic stress disorder, post concussive disorder. I have a hernia, and desisted and ripped open. My stomach is not hooked together because of the accident that I had * * *

{¶ 16} "Q. But if you do not have the capacity to care for yourself right now—

{¶ 17} "A. I do.

{¶ 18} "Q. —how can you expect to care for the kids or be there for them?

{¶ 19} "A. I have the capacity to care for myself."

{¶ 20} Here, the magistrate gently cut Mary off and asked her to focus her questions on the pertinent issues of the CPO hearing. She continued and asked a few insignificant questions before she concluded.

{¶ 21} Mary's experience with Shawn was rough. Shawn was not the ideal father or husband. His abuse of drugs and alcohol caused him to be absent from his family for days at a time. Even after they finally separated in 2002, Mary was not free from him. Twice, in the middle of the night, Shawn broke into the house where she and the children were living. Mary wrote in her CPO petition that the first break-in led to a confrontation during which he threatened her, pushed her around, held her down, pulled her hair, and scratched her. And yet, despite everything, here is how Mary describes their pre- and post-separation history:

{¶ 22} "A. Okay. As far as even when we lived together in a marriage situation, I cannot sit here and say that there was a lot of domestic violence because there was not. It was not that at all. It was more he had a very severe drug and alcohol problem to the extent that when he would be on his binges, he would disappear sort of, and not come home, not be around.

{¶ 23} "I believe that—I have no knowledge of this but I believe some of these events I just feel there was a desperation of some sort either to try to get me to agree to come back, just the reality that I was gone.

{¶ 24} "I don't think if I had ever asked him did he really, really ever intend on hurting me, I don't feel like that was ever the case. But when he would drink or do drugs, and just in a desperate sense I guess not knowing what else to do is whether these things would happen."

{¶ 25} Many people who spend time in prison claim to have been radically changed for the better by the experience. Some make such a claim deceitfully, with ulterior motives; others prove the truth of their claim with their post-prison life. For Shawn, the credibility of his claim comes from the uncommon trials that he endured. While in prison, he was diagnosed as having a bipolar condition,

which he had been previously diagnosed with many years earlier. He began taking, and continues to take, medication to treat this chemical imbalance and to control the dramatic behavioral changes that the condition often causes. He was also diagnosed as suffering from a variety of other psychological disorders for which he underwent treatment. But these conditions pale in comparison to the discovery that he, at only 34 years of age, had testicular cancer. Shawn underwent surgical procedures in which doctors not only removed a tumor-ridden testicle, but also, in an effort to prevent the cancer from spreading, opened his entire abdomen and removed all of his abdominal lymph nodes.

{¶ 26} While undergoing various treatments, he completed several personal-development programs. According to the institutional summary report of his time in prison, Shawn's participation in these programs was excellent. He completed an anger-management program. Ordinarily, this program can be completed in 12 weeks, but it took Shawn two years because he had to miss classes while he was undergoing cancer treatments. He also completed a nine-month parenting-skills program that taught him ways of resolving conflict within the family. There were also programs in which he confronted and learned how to handle situations that might arise outside prison. He participated in several mental-health classes that required him to write his personal reflections in a journal. Finally, he completed a course on resolving personal and emotional conflict. Based on the trials that he endured and his obvious efforts to better himself, it is not difficult to believe Shawn's claim that he is a changed man.

{¶ 27} Yet, based on her experiences, Mary continues to have concerns. Early in the hearing, she explained why she sought a protection order:

{¶ 28} "I guess the only thing I'm asking for is some sort of time period to see that things are going to be okay and he's going to make steps of either work or get a job or stay away from drugs, stay away from alcohol. Those kinds of things.

{¶ 29} "I'm not at all trying to interfere with him have [sic] a relationship with his children. I've never been about that or I wouldn't have allowed them to go to the prison to see him. It is not about that."

{¶ 30} This excerpt also summarizes Mary's paramount concern—evident throughout the hearing—about his fitness to parent. This is a legitimate concern, to be sure, but it is not, by itself, a concern that a protection order is designed to address. Rather, a CPO is intended to protect a family from the imminent possibility of serious domestic violence. Here, there is insufficient evidence to conclude that without a protection order Shawn is likely to seriously harm anyone.

{¶ 31} The events leading up to Mary's June 2007 request for a protection order began, for our purposes, in mid 2002, when Mary and Shawn separated. She and their four children moved in with her parents. They sought a divorce, and, while their case was pending, Shawn was granted parenting time. The first incident occurred in 2003, while Mary was still living with her parents. Shawn appeared at her parents' front door and demanded entry. Mary refused, so he went around to the back of the house and tried to cut the telephone wires running into the house. When Mary threatened to call the police, he left.[1] Although she reported the incident to the police the following morning, Shawn was not charged.

{¶ 32} The divorce became final in 2004, and in May of that year, Mary and the children moved into a home of their own. Only days after they moved, Shawn (again for unknown reasons) broke into their new home one night and confronted Mary. She testified that he was "very physical" with her. She was more descriptive in her petition, in which she wrote that he threatened her, pushed her around, held her down, pulled her hair, and scratched her. Their loud confrontation woke some of the children. (Their younger son seems to have slept through the entire incident.) Mary testified that their older son witnessed part of the altercation, while the two girls remained in their bedroom and wept. Mary eventually left the house to call the police. Shawn testified that he then gathered the children together and explained to them that the police were coming to take him away, but he was going to sit with them until the police arrived. The police did come and arrest Shawn, and they charged him with domestic violence. He spent about a week in jail before he was released. While he was in jail, Mary received a temporary protection order against him, and she had a home security system installed.

{¶ 33} Shortly after he was released, Shawn again broke into Mary's home (the record does not say why). This time he was greeted by alarm bells, and he quickly fled. The police found and arrested him. He was charged with violating the temporary protection order, operating a vehicle while impaired, resisting arrest, and two counts of aggravated burglary. Shawn pleaded guilty to violating the temporary protection order and one count of aggravated burglary. He was convicted and sentenced to a three-year prison term.

{¶ 34} A few weeks before he was released from prison, in June 2007, Mary filed a petition for a domestic-violence protection order against him. The magistrate granted the order ex parte and after a subsequent full hearing

---

1. Several questions arise from this incident that are not answered by the record. We do not know why he went to the house that night. Nor do we know why he attempted to cut the telephone wires but then fled when Mary threatened to call the police. Mary says that he did this so that she could not call for help, but that he fled because he was not sure that he cut the right wires. This seems like a reasonable explanation.

affirmed that decision. Shawn filed objections with the domestic-relations court. In November 2007, the domestic-relations court, without a hearing, overruled Shawn's objections and adopted the magistrate's decision. It is to this judgment that Shawn assigns two errors:

{¶ 35} "The Trial Court erred by granting a Civil Protection Order against Appellant regarding his children when no evidence was presented that Appellant had ever caused harm or threatened to cause harm to his children or that he was a threat to the children.

{¶ 36} "The Trial Court erred by granting a Civil Protection Order against Appellant regarding his ex-wife when no evidence was presented that Appellant had threatened petitioner or caused harm to petitioner for three years."

{¶ 37} The standard that appellate courts use to review domestic-relations protection order appeals depends on the type of challenge brought. See *Young v. Young*, Greene App. No. 2005–CA–19, 2006-Ohio-978, 2006 WL 515522, at ¶ 22. A challenge to the *scope* of an order is reviewed for abuse of discretion, while a challenge to the initial *grant* is reviewed for "sufficient competent, credible evidence." Id. Here, Shawn contends that the protection orders were improperly granted. Therefore, we will call the latter standard into service.

{¶ 38} The statute that authorizes a court to grant a domestic-relations protection order is R.C. 3113.31. One of the statute's requirements is that a petitioner state "[a]n allegation that the respondent engaged in domestic violence against a family or household member of the respondent, including a description of the nature and extent of the domestic violence." R.C. 3113.31(C)(1). See *Beach v. Beach* (Oct. 27, 1992), Franklin App. No. 92AP–321, 1992 WL 328642, at *1 ("[T]he evidence used as a basis for issuance of such an order must meet the minimal requirements of the statute defining domestic violence"). "Domestic violence" here means one or more of these acts:

{¶ 39} "(a) Attempting to cause or recklessly causing bodily injury;

{¶ 40} "(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

{¶ 41} "(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

{¶ 42} "(d) Committing a sexually oriented offense." R.C. 3113.31(A)(1).

{¶ 43} The allegations in Mary's petition comfortably fall under subsections (a) and (b).

{¶ 44} The first time that Shawn broke into her home, Mary wrote, he threatened her, pushed her around, held her down, pulled her hair, and scratched

her. At the hearing, she said only that he was "very physical" with her. These two statements are the extent of the record evidence with respect to the only time that Shawn laid a rough hand on Mary. Despite the paucity of details surrounding this encounter, it is clear that Mary suffered bodily harm. We have little doubt that she also suffered mentally and emotionally, which quite likely was the greater harm.

{¶ 45} Still, there is no evidence that Shawn intended to injure her or that he recklessly did so. Indeed, the circumstances of this incident are nowhere described. We recognize that it might be reasonable to infer from the details that are available that this was an act of domestic violence. But we are mindful of Judge Ford's observation, when discussing whether a slap to the face satisfied the definition of domestic violence in this statute, "[i]t is evident, in the resolution of such a fact-driven question, that the fact finder making such determination is required to evaluate the circumstances of each case." *Ankenbruck v. Ankenbruck* (Dec. 8, 2000), Trumbull App. No. 99–T–0144, 2000 WL 1804360, at *5 (Ford, P.J., concurring). Although this may be true, he continues, "based on the evidence presented here * * * this case does not present a sufficient factual predicate for this court to singularly address the question of whether or not a slap to the face, without any testimony relating to the slap's severity, etc., establishes domestic violence as that term is defined in R.C. 3113.31." Id.

{¶ 46} Here, we think that inferring Shawn's intent from the record, while tenuous, would be permissible. Thus a finding that he committed an act of domestic violence would sit just inside—but inside nonetheless—the boundary marking the limits of a reasonable construction of the record. Accordingly, we grant that the magistrate, though unclear in her ruling, may have found that Shawn committed an act of domestic violence under the definition in R.C. 3113.31(A)(1)(a).

{¶ 47} Mary's allegation that Shawn made "numerous threats against her" is more troublesome. The critical inquiry here is "whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm * * * [which] necessarily involves both subjective and objective elements." *Strong v. Bauman* (May 21, 1999), Montgomery App. Nos. 17256 and 17414, 1999 WL 317432. It is important to distinguish between fear of potential future conduct and immediate physical conduct, and to remember that the petitioner must show sufficient evidence of the latter. See *State v. Strunk* (Jan. 15, 1999), Hamilton App. No. C–980240, 1999 WL 12743 (determining that the evidence established only the possibility of potential future conduct, and therefore the victim failed to show that the threat was imminent); see also Ohio Domestic Violence Law (2004), Section 8.7, at 254 ("It is important for a petitioner to testify both about the act and the fear caused by the act.

Absent actual testimony about the fear of imminent serious physical harm caused by a particular threat, a trial court cannot imply and conclude that the fear exists"). As an illustration, consider the case of *Henry v. Henry,* Ross App. No. 04CA2781, 2005-Ohio-67, 2005 WL 43888. There, the court concluded that the husband's death threat, which was conditioned on his wife's taking custody of their child, and his threat to burn down the house were not imminent. The court found that the wife failed to present any evidence at the hearing that he intended to carry out these threats immediately. Moreover, said the court, she presented no evidence that she believed the threats were imminent or that she feared serious physical harm.

{¶ 48} We scoured the record but, like the *Henry* court, were unable to find evidence of a threat of serious physical harm. Mary did not reveal the content of Shawn's alleged threats, much less that they were of serious physical harm. Nor does her testimony suggest that he intends to carry out these unknown threats immediately. Instead, with respect to the children, she admits that Shawn has never harmed them or indicated that he would harm them. She also admits that while he was in prison and since his release from prison, he has not threatened her.

{¶ 49} Finally, we observe that though neither party suggests it, the magistrate may have found that Shawn committed the offense of aggravated trespass—also an act of domestic violence according to R.C. 3113.31(A)(1)(b). (It is not necessary for him to be charged with or convicted of this offense.) To commit this offense, one must "enter or remain on the land or premises of another with purpose to commit on that land or those premises a misdemeanor, the elements of which involve causing physical harm to another person or causing another person to believe that the offender will cause physical harm to him." R.C. 2911.211(A). Our analysis here is similar to that above under R.C. 3113.31(A)(1)(a). While there is no evidence attesting to Shawn's purpose in entering Mary's home or remaining there, we grant that one could make the tenuous inference that at the very least, he remained in her house for the purpose of causing her harm. Accordingly, we will also grant that the magistrate might have found that Shawn committed an act of domestic violence under subsection (b) by violating R.C. 2911.211.

{¶ 50} Nevertheless, the occurrence of past domestic violence is only some evidence supporting a petitioner's argument that more violence is imminent. "While it is true that past acts may be used to establish a genuine fear of violence in the present situation, there must be an indication that the person was fearful in that present situation. Merely finding that there were past acts of domestic violence, without anything more, is not enough to warrant a present civil protective order." *Solomon v. Solomon,* 157 Ohio App.3d 807, 2004-Ohio-2486,

813 N.E.2d 918, at ¶ 27; see also *Lain v. Ververis* (Oct. 18, 1999), Preble App. No. CA99–02–003, 1999 WL 893611. "The statutory criterion to determine whether or not to grant a civil protection order pursuant to R.C. 3113.31 is the existence or threatened existence of domestic violence." *Thomas v. Thomas* (1988), 44 Ohio App.3d 6, 8, 540 N.E.2d 745. The petitioner must establish this by a preponderance of the evidence. *Felton v. Felton* (1997), 79 Ohio St.3d 34, 679 N.E.2d 672, paragraph two of the syllabus. Therefore, showing only that the respondent committed an act of domestic violence in the past is not enough.

{¶ 51} Despite Shawn's past act of putative domestic violence, Mary has not shown a present fear of future domestic violence or established a reasonable basis for such a fear. We determined above that the evidence fails to show that Shawn ever made any actual threats of domestic violence. Her response to the magistrate's questions confirms this:

{¶ 52} "Q. Are you in fear of your physical safety?

{¶ 53} "A. Yes, I am.

{¶ 54} "Q. Based on the past events?

{¶ 55} "A. Just based on the past."

{¶ 56} Mary argues, however, that the past act is enough to warrant a protection order. She points to the case of *Haynes–Soper v. Garrett* (Sept. 14, 2000), Franklin App. No. 00AP–264, 2000 WL 1289450, for support. She contends that fear of future domestic violence is reasonable solely because of the respondent's impending release from prison, when the reason for the respondent's imprisonment was acts of domestic violence against the petitioner. In *Haynes–Soper*, the respondent ex-husband pleaded guilty to a felony domestic-violence charge for assaulting the petitioner ex-wife, and he was sentenced to five years in prison. The ex-wife alleged that during his assault, he broke her arm in two places and beat her severely. A month before he was to be released, she petitioned for a protection order, which the court granted.

{¶ 57} This case is distinguishable for at least three reasons. First, unlike the issue before us here, the issue before the *Haynes–Soper* court was not whether the protection order was properly granted. Rather, it had to decide whether the trial court's failure to hold a full hearing before granting the order was permissible. Consequently, there is little relevant analysis. Second, the ex-wife in the case suffered far more physical injury at the hands of her ex-husband than Mary did. While Shawn did physically harm Mary, the nonserious nature of her injuries does not urge that the same level of caution be taken in the absence of actual threats. Finally, Shawn was convicted and sentenced for aggravated burglary and violating a temporary protection order, not for domestic violence.

{¶ 58} The problem (in the instant case) with the lower court's decision is not its determination of the facts. That is, we do not disagree with its, or the magistrate's, evidentiary decisions with respect to credibility and weight. The fundamental problem, rather, is that there are simply not enough facts, or evidence, to support the grant of a protection order. That said, we will address one important fact that the lower court uses to support its decision. But we do so not because we dispute its veracity but because, when considered, it actually weakens the court's argument.

{¶ 59} The court starkly stated the fact this way: "While in prison he was diagnosed as bi-polar." Mary testified that Shawn was diagnosed with a bipolar condition many years before entering prison, not, as this statement seems to imply, for the first time while in prison. That he evidently suffered from this condition for many years prior is significant. It is well known that untreated, this condition often causes the sufferer to cycle through extreme manic and depressive states of mind, causing significant behavioral changes. Fortunately, with proper treatment, those suffering from the condition can look forward to a good prognosis. Shawn's condition, then, could help explain—though not excuse—Shawn's behavior, including his abuse of drugs and alcohol. Perhaps more important is the evidence that before being rediagnosed in prison, Shawn was not taking medication for the condition because he could not afford it. Now, however, he has medical insurance that permits him to take the necessary medication to control the condition.

{¶ 60} A domestic-relations protection order should be issued in the face of imminent domestic violence. Accordingly, the evidence must reveal more than the mere possibility of violence potentially occurring sometime in the future. We are not without sympathy for Mary. While Shawn had trials in prison, Mary too, for many years before, endured her own trials. She is understandably weary of him. But it is inappropriate to use a protection order merely to create a buffer-zone around Mary and the children while she decides whether contact with Shawn is a good idea. It is a means to prevent imminent physical harm, and there is little evidence that Shawn is likely to harm her or his children. What is evident, though, is his desire to spend time with his children:

{¶ 61} "Q. Basically are you just asking this Court to continue the visitation that you currently have with your children pursuant to the prior decree of divorce?

{¶ 62} "A. I am, yes."

{¶ 63} There is no reason that he should be prevented from doing so by a civil protection order.

{¶ 64} Shawn's two assignments of error are sustained. The judgment of the domestic relations court is reversed, and the civil protection orders against Shawn are vacated.

Judgment accordingly.

WOLFF, P.J., concurs.

FAIN, J., concurs in part and dissents in part.

FAIN, Judge, concurring in part and dissenting in part.

{¶ 65} For all of the reasons set forth in Judge Brogan's opinion, I join in reversing and vacating as much of the civil protection order from which this appeal is taken that pertains to the children of the parties.

{¶ 66} I would, however, affirm that part of the civil protection order that pertains to Mary.

{¶ 67} There is evidence in the record from which the trial court could find that Shawn entered or remained on Mary's premises "with purpose to commit on * * * those premises a misdemeanor, the elements of which involve causing physical harm to another person or causing another person to believe that the offender will cause physical harm to him." This is aggravated trespass, a violation of R.C. 2911.211. Significantly, there is no "serious" component to the physical-harm element in aggravated trespass. The commission of aggravated trespass is, itself, an act of domestic violence justifying a civil protection order. R.C. 3113.31.

{¶ 68} "The judgment of a lower court should not be reversed, unless the error is manifest, and it is entitled to that construction of its record which is most favorable to the judgment." *Ford v. Toledo* (1901), 64 Ohio St. 92, 99, 59 N.E. 779. In other words, the presumption of regularity requires us to presume, unless the record affirmatively rebuts that presumption, that the trial court made any finding of fact that is both supported by evidence in the record and necessary to the order or judgment from which the appeal is taken. See 5 Ohio Jurisprudence 3d 181 et seq., Appellate Review Section 458.

{¶ 69} Applying the presumption of regularity, I would presume that the trial court found that Shawn had committed an act of domestic violence against Mary, in the form of a violation of R.C. 2911.211, which would support the civil protection order as it pertains to Mary.