[Cite as *Dodds v. Stamper*, 2018-Ohio-193.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| HELEN DODDS on behalf of<br>S.S. and D.S. | : | |
| | : | |
| | : | C.A. CASE NO. 2017-CA-21 |
| Plaintiff-Appellee | : | |
| | : | T.C. NO.  2017-DR-59 |
| v. | : | |
| | : | (Civil Appeal from |
| BOBBY STAMPER | : | Domestic Relations Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . .

Rendered on the 19th day of January, 2018.

. . . . . . . . . .

HELEN DODDS
     Plaintiff-Appellee, pro se

REBECCA BARTHELEMY-SMITH, Atty. Reg. No. 3474, 7821 North Dixie Drive, Dayton,
Ohio 45414
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the June 22, 2017 Notice of Appeal of Defendant-Appellant Father.  Father appeals from the trial court's May 30, 2017 Journal Entry and Order of Protection, issued against Father after a May 23, 2017 hearing on the

"Petition for Domestic Violence Civil Protection Order (R.C. 3113.31)," filed by Plaintiff-Appellee Grandmother, on behalf of S.S. and D.S., Father's children.

{¶ 2} Grandmother filed her pro se petition on March 21, 2017, and an ex parte order was issued on the same day. The petition provides in part:

3.    Respondent has engaged in the following act(s) of domestic violence: (Describe the acts as fully as possible. * * *.)

*** [M]y Father, would abuse my Mother, Sister and myself.   He would hit (with fist), slap, choke, kicked [sic].   He would verbally, mentally, and physically abuse us.   Saturday night I was working cashier I heard the door ring so I looked over and I saw my dad [Father] and [T.H.] walk in. When they did so my dad looked at me the way he did when he just got finished beating my mom and I know I couldn't help her.   I started breathing really hard it felt like I was going to pass out.   I went to the back and told my manager Lindsey that I couldn't take his order because I thought I still had a protection order against him.   So I had another co-worker go up to take his order and once he relized [sic] I wasn't coming back up to the front he left.   I stayed in the back for a couple minutes after he left because I was still scared.   Once I calmed I called the police.

{¶ 3} A full hearing on the petition was scheduled for April 3, 2017.   On April 4, 2017, the court issued a "Journal Entry" that provides that the parties were present on April 3, 2017, and that the hearing was continued to allow Father to obtain counsel.

{¶ 4} At the full hearing on the petition, by way of background, Grandmother made the following opening statement:

Yeah, the girls - - I had not came into court before to get a - - get a protection order. In the beginning, I didn't realize the other one was not covering them.

And then when I did, [D.S.] wanted to come in but we haven't had a problem until he showed up at Lee's and [S.S.] had to call me. Then both girls proceeded to demand a protection order so then we filed one.

{¶ 5} Grandmother indicated that she has custody of S.S. and D.S. Grandmother called A.C., the mother of S.S. and D.S. ("Mother"), to testify. According to Mother, she was unhappy with Grandmother because Grandmother let S.S. obtain employment at Lee's Famous Recipe in Springfield, where Father resides. Mother stated she was aware that Father knew where S.S. was working, and that she spoke to Father "on the phone because I was allowed to speak with him when the children were involved and he told me that [S.S.] worked at KFC and I just agreed with it. And he called me a lying b**** and he said I know she works at Lee's."

{¶ 6} The following exchange occurred:

Q. And did you file a petition for protection in Kentucky?

A. Yes, I did because he was there the first week of December.

Q. And on that petition, did it say that he was to stay away from [S.S.] at Lee's?

A. Yes, and gave the address of my job and hers and I have proof.

{¶ 7} Mother produced "exhibit 1 through 4 and it's a copy of the protective order summons that I requested in Morehead, Kentucky out of Rowan County." Exhibit 1 is a December 29, 2016 "Protective Order Summons" issued to Father; Exhibit 2 is a

December 29, 2016 "Petition/ Motion for Order of Protection"; Exhibit 3 is a an untitled page identifying Mother as "Petitioner"; and Exhibit 4 is a "Motion for Relief" reflecting S.S.'s address at Lee's Famous Recipe and Mother's residential and work addresses. According to Mother, "on exhibit 4, it does have my work address and [S.S.'s] work address - - well the name of where she works and address." The following exchange occurred:

Q. You did not get another protection order for another five years that you were supposed to, right?

A. Correct.

Q. Why not?

A. Because [S.S. and D.S.] did not want to go in and face court with him again. At that time, you had custody because I lost them because of the drugs and the drinking that I did that he had provided the whole time we were together. And I admitted it in this court and it's on record.

Q. And is that one of the reasons the girls don't want to be without the protection order?

A. Yes.

{¶ 8} Mother stated that Father was released from prison at the end of 2015 and was arrested at her home in January of 2016. Mother stated that she and Father were divorced at the time, and that Father "was there, on a restraining order and I let him in. I mean he went to prison. He stalked us repeatedly." The following exchange occurred:

Q. * * * After he got picked up at your house after he was out of prison - -

* * *

Q. - - when he got back out of jail for that, did he come back to the house again?

A. Two days later.

Q. Was he giving you - - providing you and the girls with alcohol and drugs and et cetera?

MS. BARTHELEMY-SMITH: Your Honor, I would object to the relevancy. I - - there's - - we're - - the petition states that there was a - - a recent incident where my client went to the Lee's Famous Recipe.

* * * they're talking about several years prior to this petition, Your Honor. I don't think it's relevant.

THE COURT: I wouldn't - -

* * *

THE COURT: - - say it's several years prior and I do think it is relevant. Goes to foundation to determine whether there is - - a concern for imminent danger so you may proceed.

* * *

A. It was January of '15 when he was arrested and two days after he was arrested, he came back to the house and I told the girls that if their probation officer Holly Davis had asked, do not lie because I knew at that point I couldn't protect them and then I lost them in June.

Q. Did he start to try to threaten you and the girls and was abusing you again?

A.   Yes, he actually called my father twice.   He's called - - notified my friends several times to get ahold of me, who I gave his name to also his probation officer.

MS.  BATHELMELY-SMITH: Your  Honor,  I  would  object.   It's hearsay again as to - - she's saying that he talked to her father.   It's all hearsay.

THE COURT:   That objection is overruled.   You can continue.

THE  WITNESS:   Actually  I  came  up  for  court  in  August  or September of 2016 for the girls to this court and he actually went through Christy [H.'s] (phonetic) front door and tried to attack me and the guy that I was dating at the time.

The police were called and notified but nothing was followed up on it. And his name was Edgar [H.].   Madison wrote out a statement.   Christy wrote out a statement and I talked to the state - - officers.   It was Officer Molton (phonetic) and Officer Hughes (phonetic).

{¶ 9} On cross examination, the following exchange occurred:

Q.   When's the last time that you've seen [Father]?

A.   The  last  time  actually  was  in  March - -  or  April.   I  apologize. April 3rd.

Q.   Of this year?

A.   Yes.

Q.   And then prior to that, when's the last time that you've seen him?

A.   When we were in court in January in Kentucky.

Q. * * *And that was in - - what year was that?

A. This year.

* * *

Q. And those - -that protection order was dismissed, is that correct?

A. Yes.

Q. The court dismissed it?

A. Yes.

Q. And there was a hearing, is that correct?

A. Yes.

Q. * * * and then it was dismissed?

A. Yes.

Q. Prior to that, when was the last time that you'd seen [Father]?

A. I want to say - - June. Actually, the day that I left to move to Kentucky, he was there.

Q. June of what - -

A. 2016. I had already lost my kids.

Q. * * * And how long had the children been residing with [Grandmother]?

A. Well, they actually went to go live with her June 11th of 2016. [S.S.] remains with her. The other one comes with me.

Q. I'm sorry?

A. The other one - -

* * *

Q. Does she live with you now?

A. No, she will be. Thursday.

**{¶ 10}** Mother stated that Christy H. was a friend of hers, and that Father "came through her door. He actually just walked in." Mother stated that Father "would contact [H.] to get ahold of me because I wouldn't let him have my phone number and * * * they gave him six months when he went back to court for being arrested at my house and we could talk, if it was in reference to the children. But I wouldn't let him have my phone number so he'd call her." When asked when she last had phone contact with Father, the following exchange occurred

A. * * * Actually, I believe it was November because I left court here and they were going to return my children to me.

But something had happened that he had asked to come to Kentucky to work so the prosecutor with evidence automatically thought that I was allowing him around me which eventually would lead him to the kids because I did in the past.

Q. So - -

A. So at that point, I called him, told him that I did not get the children back and I told his PO this, too.

I called him, told him I did not get the kids back because of what he did and at this point forward, that he was not to contact me, my father, Christy or get ahold of me any other way, shape or form.

**{¶ 11}** S.S. testified that she is 17 years old, and that she wants a protection order against Father for "a lot of reasons honestly. He showed up at my work a couple months

ago." S.S. stated that at the time, she "got scared and I went to the back and I just sat there until * * * he left because it's frightening 'cause my dad - - I mean my dad hit on my mom," and "you don't just get over something like that." S.S. stated that after Father left work, she "called my grandma and I told her what happened and she came and picked me up from work." S.S. stated that in the past, Father has hit her, choked her, and given her drugs and alcohol, and that she is afraid of him.

{¶ 12} S.S. stated that the last time Father was threatening to her was in January of 2016 when he "started getting mean towards the end and then he got caught at my house so - -." The following exchange occurred:

Q. What happened when they caught him at your house?

A. My old probation officer Holly Davis came in and she had officers with her and they came in and they asked where my dad was and - - of course I didn't mean I didn't - - I was like scared to I mean I just froze and they - - we - - they asked if we could - - he could search our house and we said yeah and they found him in my bedroom.

* * *

Q. Do you feel threatened when your dad approaches you or comes by or - - shows up anywhere?

A. Yeah.

Q. Will the protection order make you feel safer?

A. Yes.

{¶ 13} On cross examination, S.S. stated that she and her Father did not speak with each other when he came into Lee's Famous Recipe, and that when she came back

to the front of the restaurant he was gone. She stated that in January of 2016, Father took her to the hospital when she was ill. She stated that during the January 2016 time period, Father gave her and Mother marijuana, and that he provided Coors Light in a "big cooler" for them and Mother's friends. The following exchange occurred:

Q. Before that in January of 2016, you had had no contact with your dad, had you?

A. He was there for about - - he was there for quite a bit. He was there for maybe like four or five months before he got caught.

Q. * * * And when was the last time that he hit you?

A. He didn't physically abuse me when he came back - - when he got out of prison and came back to my house, so - - before that, it would be - -when - - right when - - before we moved here which is 2013, 2014.

* * *

Q. And you weren't scared of him in 2016, were you?

A. Yeah.

Q. You were scared of him?

A. Yeah.

Q. Were you the one that called - - called him to take you to the hospital?

A. I didn't call him.

Q. Who did?

A. My mom.

Q. You don't want to have any contact with him, is that correct?

A. That's correct.

* * *

Q. So when you're saying he hit you, where'd he hit you at?

A. He just - - anywhere he could. I mean we'd try to protect ourselves but we * * * couldn't really.

Q. Did he spank you?

A. He'd spank us with his hand. He'd use a belt.

Q. So that - - nothing's been done - - anything like that at all since 2014; is that correct?

A. Yeah.

Q. Is that a yes?

A. Yes.

{¶ 14} On redirect examination, S.S. testified that in 2016 when Father was at her house, he "didn't call us names but he didn't - - he didn't threaten me at that time 'cause he was scared he was going to get caught there again." In response to questions from the court, S.S. testified that she was scared of Father during the January 2016 time period because of the "destruction" that "he can cause." The following exchange occurred:

[The Court]: Tell me about that destruction.

A. It's scary. You can't just get up and live on like it never happened or act like you've never seen it or been through it.

Q. Be specific about what kind of destruction you're talking about.

A. Like the - - the physical abuse towards my mother and towards my sister and I.

Q. You said he spanked you. Was there other things that he did other than spank you?

A. He'd punch us.

Q. Anything else?

A. Oh, he'd kick us.

Q. Do you have reason to believe that if he was allowed around you, he would do the same thing?

A. Yeah.

* * *

Q. And why is that?

A. He has a very short temper.

{¶ 15} D.S. testified that she is 14 years old, and that she doesn't "want my father stalking us or being around us anymore." She stated that Father "hit on my mom and hit on us." When asked about the time period for the abuse, D.S. stated that it was "[a]bout a couple years ago before we started coming back here. Oh, we moved from their place to the Caring Kitchen to Nana's and - - it was so bad that we had to move out of the Caring Kitchen because he stalked us there." D.S. stated that when Father returned to her home he provided her with alcohol and cigarettes, and that he gave Mother drugs. She testified that Mother paid for the drugs with sex.

{¶ 16} On cross examination, D.S. stated that Father "stalked us" in his car, and that she observed "him going around our house. Or him having his family go around our house." The following exchange occurred:

Q. When was this?

A. Every - - since he got out and before he got out.

Q. How many times did you see his car?

A. A lot.

Q. Like how many times?

A. Maybe - - maybe two times each day.

Q. Each day of what day [sic]?

A. Like week - - out of a week and sometimes more days.

Q. When did this happen, what year?

A. I don't know when. About - - a couple years ago.

* * *

Q. And you haven't seen his car at all since 2016; is that correct?

A. Well, yeah, we have.

Q. You have?

A. Yeah.

Q. We saw him in different cars.

A. * * * Where did you see him at?

Q. Going past my Uncle Chris's when we were living with my Nana there and - - went past our house that we live in now.

Q. When's the last time you saw your dad?

A. Not for a little bit. About maybe - - a couple weeks now, about - - maybe a month or so about.

Q. Where'd you see him at?

A. Our - - in going in front of our house like we have this little drive

thingy.

Q.   And you saw your dad?

A.   Yes.

Q.   Did you talk to your dad?

A.   No.

Q.   Was he just going - - driving?

A.   Yes. But he was - -

Q.   Where were you at?

A.   - - staring.

Q.   Where were you at?

A.   Inside the house looking.

Q.   You looked outside the window?

A.   Yeah.

* * *

Q.   - - do you do that every day?

A.   Yeah, 'cause we - - like - - 'cause like we have like this little thing in front of our house and we can tell like - - and there was a slow car going by and it was him.

* * *

Q.   And what kind of car was it?

A.   It was a red - - I want to say Grand Prix.

Q. * * * How many people were in the car?

A.   I only saw him.

Q. And do you know what day this was?

A. No. I'm sorry.

Q. Was it a couple months ago?

A. About a month ago.

{¶ 17} In response to questions from the court, D.S. stated that she is afraid of Father, and that without a protection order, she believes that he will hurt her again. She stated that she does not trust Father, and that "he was never a real dad." On recross-examination, D.S. stated that Father last physically abused her when she was 11, and that she is about to turn 15.

{¶ 18} Grandmother testified as follows:

The girls are terrified that he's going to show up. They're terrified when he's around. They're always afraid. They can't get past it.

[Mother's] afraid. They come in and tell me dad's here, dad's here. I don't know, I haven't saw him. But I have saw that car she's talking about and it did look like him.

I can't prove that it was but the girls don't feel safe without that protection order. And that's all I have to say.

{¶ 19} The court then asked Grandmother to describe S.S.'s demeanor after Father appeared at Lee's Famous Recipe, and Grandmother testified as follows:

A. She was nuts. She was all freaked out. She had called me. She had called the police but we didn't have a protection order because I thought they would be fine and - - she was afraid.

She said that he came in, that she ran to the back, that he stayed

there for - - she didn't know how long and wouldn't come out and her boss said she couldn't function at her job, just go ahead and take her home.

{¶ 20} Father testified that he and Mother were divorced while he was in prison in 2014. He stated that he was released from prison in November 2015, having served 18 months for violating a protection order. Father stated that he is currently on probation. He stated, "when I got released from prison, I was clean. When they caught me at [Mother's] house and the girl's taken to the hospital, that's when I - - they got me and arrested me. I got - - put on probation then for that." Father stated that in January of 2016, Mother called Father's mother to report that S.S. was ill. Father stated that "at the time I was released. [Mother] and them did not know it. My mother dropped the phone crying." He testified that he picked up the phone and Mother told him that S.S. "was admitted in the hospital six days before, got out, was losing fluid out of her spine and - - she said she has no way to get to the hospital." Father stated that he took S.S. to the hospital and that he was arrested a few days later.

{¶ 21} Father denied driving by S.S. and D.S.'s residence, and he stated that he does not know where they live. Father stated that he drives "a green Ford 150 truck," and that he "had a red vehicle but I sold that" four or five months ago. He stated that he never spanked, kicked, or beat his children with a belt. When asked how he disciplined his children, he replied, "plenty of witnesses, looked at [Mother] and said deal with them." He stated that he and Mother last lived together four and a half to five years ago. Father testified that "the last time that I heard from [Mother], it's been a while ago. She said I'm going to court to get my children back. They will be residing with me in Kentucky." According to Father, Mother "contacted me when I was with one of my friends in Troy

looking at a car.   And she said this is all your fault, I didn't get my children but now you think you're funny * * * I will have my children living with me and this is the last time you'll hear from me."

{¶ 22} Father stated that when he went to Lee's Famous Recipe, he "was surprised.   I did not know it was [S.S.] 'cause I haven't seen her * * *."   He stated that he "looked up at the register girl which was [S.S.] and she looked at me.   She smiled.   I smiled.   I seen her put her head down.   I put my head down.   It bothered me.   [S.S.] walked away.   I walked away."   Father stated that he was only in the restaurant for "seconds" before he left.   He testified that at the time, he was not trying to contact S.S. and that he did not know that she worked there.   He stated that S.S. was living with her grandmother at the time in Urbana.

{¶ 23} Father stated that he understands that his children do not want to see him, and that he does not have a problem with respecting their wishes in the absence of a protective order.   Regarding Christy H., Father stated that Christy "called me up and asked me to come up for dinner.   I did not know [Mother] was there or whoever she was with.   I'm so good a friends with Christy [H.], I knocked on her door and walked right in." According to Father, when he "opened the door, [Mother] was there and she was already up in my face.   The only thing that I know is * * * I don't even want to be here."   Father stated that "it looked like it was a set-up to me, that they both knew.   I turned around, walked away." Father testified that he did not get into a confrontation with anyone, and that no charges were filed.   Father denied giving his children alcohol or marijuana.   He stated that he never smokes marijuana, and that Mother smokes marijuana on a "[c]onstant basis."   He stated that when he and Mother were together, he drank alcohol

occasionally and that she "was drinking every day." Father stated that he is in mental health counseling, having attended six sessions in Springfield. He stated that he has attended counseling before in Champaign County and in prison. Father stated that S.S. and D.S. are "being brainwashed" by Mother and Grandmother.

**{¶ 24}** In its "Journal Entry" granting the protection order, the court indicated as follows: "Based upon the testimony and evidence presented, the Court finds that Respondent is engaging in a pattern of behavior that knowingly causes [S.S.] and [D.S.] to believe he will cause them physical harm and causes them significant mental distress."

**{¶ 25}** Father asserts two assignments of error herein. His first assigned error is as follows:

THE LOWER COURT ERRED IN GRANTING A DOMESTIC VIOLENCE PROTECTION ORDER WHICH WAS ISSUED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 26}** Father asserts as follows:

Appellant, [Father] had no intention of seeing his daughter, [S.S.] Even if the court believes that [Father] knew that [S.S.] worked at Lee's there was no testimony that he knew her schedule. Furthermore, there was no harm intended. How would he knowingly cause her mental distress when she wasn't in mental distress when he took her to the hospital in January of 2016. Furthermore, [D.S.] is on the protection order and he has not seen his daughter, [D.S.] for over a year. He had no intention of causing either of the children any mental distress.

The Petitioner failed to prove a pattern of conduct on behalf of

[Father]. Showing up once to [S.S.'s] work is not a pattern of conduct. [D.S.] tried to testify that she thought her dad was driving by, however, the testimony was so unclear, that this cannot be deemed credible or reliable.

The daughters testified that it has been more than four years since any physical harm has been done to them. * * *

{¶ 27} As this Court has previously noted:

The decision whether to grant a protection order is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Parrish v. Parrish*, 95 Ohio St.3d 1201, 765 N.E.2d 359 (2002). In *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), the Supreme Court held:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126, 482 N.E.2d 1248, 1252. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo,* would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

Before granting a civil protection order, "the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), paragraph two of syllabus.

*Albers v. Albers*, 2d Dist. Greene No. 11 CA0060, 2012-Ohio-3838, ¶ 11-12.

{¶ 28} R.C. 3113.31(A) defines domestic violence as follows:

(A)   As used in this section:

(1) "Domestic violence" means the occurrence of one or more of the following acts against a family or household member:

(a)   Attempting to cause or recklessly causing bodily injury;

(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(d) Committing a sexually oriented offense.

{¶ 29}   R.C. 3113.31 (C) provides in part:

A person may seek relief under this section on the person's own behalf, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court.   The petition shall contain or state:

(1) An allegation that the respondent engaged in domestic violence against a family or household member of the respondent, including a description of the nature and extent of the domestic violence.

{¶ 30} R.C. 3113.31(E) provides that "[a]fter an ex parte or full hearing, the court may grant any protection order * * * to bring about a cessation of domestic violence against the family or household members."

{¶ 31} We conclude that herein, the only relevant definition of domestic violence is found in R.C. 3113.31(A)(1)(b). As this Court has further noted:

* * * "[W]hile the court may consider past acts to determine whether the incident at issue constitutes domestic violence, the issuance of a civil protection order cannot be based solely on previous incidents of alleged domestic violence." *Solomon v. Solomon,* 157 Ohio App.3d 807, 813 N.E.2d 918, 2004–Ohio–2486, at ¶ 23 (Citation omitted.). "Rather, the petitioner must establish by a preponderance of the evidence that an act of domestic violence occurred on the date set forth on the petition for a civil protection order." *Id.* (Citations omitted.).

*Weber v. Weber*, 2d Dist. Greene No. 2010-CA-40, 2011-Ohio-2980, ¶ 33. "However, in so doing the petitioner may rely on past acts to establish a genuine fear of violence *in the present situation.* * * *."* *Solomon, supra* at ¶ 23*.* "It is important to distinguish between fear of potential future conduct and immediate physical conduct, and to remember that the petitioner must show sufficient evidence of the latter." *Williamson v. Williamson*, 180 Ohio App.3d 260, 2008-Ohio-6718, 905 N.E.2d 217, ¶ 47 (2d Dist.).

{¶ 32} Since the allegation of domestic violence in the petition only involves S.S.,

we will initially address the grant of the petition in favor of S.S. As this Court previously noted:

> * * * Under the first statutory grounds, R.C. 3113.31(A)(1), [Grandmother] must prove by the preponderance of the evidence that (a) petitioner has a reasonable belief that she was in fear of imminent serious physical harm, (b) as a direct result of the respondent's force or threat of force. R.C. 2901.01(A)(1) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." With regard to imminence, this court has previously held that because civil protection orders are intended to prevent violence before it happens, imminence does not require an offender to carry out a threat immediately or to be in the process of carrying it out. *Young v. Young,* 2d Dist. Greene No. 2005–CA–19, 2006–Ohio–978, ¶ 105. Instead, "the critical inquiry under the statute is whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm. This inquiry necessarily involves both subjective and objective elements. * * * Therefore, we must determine whether [the petitioner] * * * had a reasonable belief that * * * [the offender] would cause her imminent, serious physical harm." *Id.* at ¶ 106.
>
> R.C. 2901.01(A)(5) defines "serious physical harm to persons" as any of the following: "(a) any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (b) any physical harm that carries a substantial risk of death; (c) any

physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; or (e) any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."

*Charles v. Peters*, 2d Dist. Greene No. 2015-CA-52, 2016-Ohio-1259, ¶ 20-21.

{¶ 33} We conclude that Grandmother failed to present sufficient evidence for a reasonable trier of fact to conclude that S.S. was placed in fear of imminent serious physical harm from Father's conduct. Mother's testimony was only addressed to past incidents involving her and Father. As noted above, the alleged incident of domestic violence involved Father entering Lee's Famous Recipe, making eye contact with S.S., and leaving after she retreated to the back of the restaurant. There was no evidence of any force or threat of force. While S.S. testified that Father physically abused her in the past, as noted above, the issuance of a protection order cannot be based solely on previous incidents of domestic violence. Even if S.S. related the history of past abuse to establish a genuine fear of violence when Father entered Lee's Famous Recipe, the alleged incident occurred in a place open to the public, in the presence of others, and we conclude that S.S. in the petition alleged fear of potential future conduct and not immediate physical conduct. We further note that S.S.'s testimony was inconsistent. She testified on direct that Father last acted in a threatening manner towards her in January of 2016 when he "started getting mean," and she testified on redirect that Father did not threaten her in 2016 while at her residence because "he was scared he was going

to get caught there again."  Finally, S.S. stated that Father has not physically abused her since 2014, close to three years before the petition was filed.

{¶ 34}  As this Court further noted in *Charles*, ¶ 23:

The second ground for a protection order is set forth in the menacing by stalking statute, R.C. 2903.211, which requires a petitioner to produce evidence to establish that (a) respondent has engaged in a pattern of conduct to knowingly cause the petitioner (b) to have a reasonable belief that the respondent will cause her physical harm or mental distress. R.C. 2901.22(B) provides that a "person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." "As to whether the offender engaged in the conduct at issue in order to 'cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person,' the State need not prove that the offender explicitly threatened the victim." *State v. Smith,* 9th Dist. Summit No. 25869, 2012–Ohio–335, ¶ 20. "Instead, the offender's knowledge that the conduct will result in the victim fearing physical harm or suffering mental distress can be inferred by the circumstances." *Id.* Pursuant to R.C. 2901.01(A)(3), physical harm includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." "Mental distress" is defined in R.C. 2903.211(D)(2) as:

(a) Any mental illness or condition that involves some temporary

substantial incapacity; [or]

b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

**{¶ 35}** We conclude that Grandmother failed to present sufficient evidence that Father knowingly engaged in a pattern of conduct to cause S.S. to believe that Father would cause her physical harm or mental distress. S.S.'s instant allegation of domestic violence was limited to a single incident of Father entering Lee's Famous Recipe, making eye contact with her and departing, and we conclude that a pattern of conduct is not demonstrated.

**{¶ 36}** Finally, as this Court noted in *Charles*, ¶ 25:

The third ground for a domestic violence protection order is based on the Trespass statute, R.C. 2911.211, which provides, "No person shall enter or remain on the land or premises of another with purpose to commit on that land or those premises a misdemeanor, the elements of which involve causing physical harm to another person or causing another person to believe that the offender will cause physical harm to him." Therefore, to obtain a protection order on the basis of a violation of R.C. 2911.211, [Grandmother] was required to prove by the preponderance of the evidence that (a) [Father] trespassed on her property, (b) causing physical harm, or (c) to cause [S.S. and D.S.] to believe that he would cause physical harm to her. *See, e.g., Bach v. Crawford,* 2d Dist. Montgomery No. 19531, 2003–

Ohio–1255, ¶ 22.

{¶ 37} Grandmother presented no evidence that Father, who entered a restaurant open to the public, trespassed with a purpose to cause physical harm to S.S. or to cause S.S. to believe that he would cause her physical harm. We conclude that the trial court abused its discretion in granting the order of protection in favor of S.S., since Grandmother failed to produce sufficient evidence that an act of domestic violence occurred when Father entered Lee's Famous Recipe.

{¶ 38} There was no allegation of domestic violence against D.S. in Grandmother's petition. There was no evidence that Father placed D.S., by force or threat of force, in fear of imminent harm, and we conclude that D.S. alleged fear of potential future conduct at the hearing. We further conclude that there was no evidence that Father committed menacing by stalking by causing D.S. to fear that he would cause her physical harm or mental distress. D.S. stated that Father last physically abused her when she was 11 years old, and that she is about to turn 15. Her testimony regarding Father repeatedly driving past her residence is inconsistent; she initially stated that it happened "a couple years ago," but then that she last saw him "a couple weeks now, about - - maybe a month or so about." D.S. testified that she did not interact with Father and only observed him from inside her home. We recognize that D.S. testified that she is in fear of her father. The evidence was insufficient to establish a pattern of conduct, however, on this record. Finally, there was no evidence presented that Father committed aggravated trespassing in driving by the residence.

{¶ 39} For the foregoing reasons, Father's first assignment of error is sustained; Grandmother did not establish by sufficient evidence her entitlement to a protective order.

**{¶ 40}** Father's second assignment of error is as follows:

THE LOWER COURT ERRED IN ALLOWING HEARSAY AND IRRELEVANT EVIDENCE AND ALLOWING A PRO SE LITIGANT LEEWAY.

**{¶ 41}** Having concluded that the trial court abused its discretion in granting Grandmother's petition for a protective order, further analysis of Father's second assignment of error is not required.

**{¶ 42}** Having sustained Father's first assignment of error, the judgment of the trial court is reversed, and the order of protection against Father is vacated.

. . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Rebecca Barthelemy-Smith
Helen Dodds
Hon. Lori L. Reisinger